Filed 7/21/16  P. v. Givan CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>GLENN GIVAN,<br><br>    Defendant and Appellant. | F069273<br><br>(Super. Ct. No. SC063377A)<br><br>**OPINION** |

-ooOoo-

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Michael G. Bush, Judge.

Elizabeth Campbell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Ivan P. Marrs, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]Before Gomes, Acting P.J., Detjen, J., and Smith, J.

Glenn Givan filed a petition seeking resentencing pursuant to the Three Strikes Reform Act of 2012 (the Act). The parties agreed Givan was eligible for resentencing, but differed on whether Givan posed an unreasonable risk of danger to public safety if he were resentenced. The trial court agreed with the district attorney and denied the petition.

We reverse the order denying the petition and remand the matter to the trial court for reconsideration because a critical fact on which the trial court relied is unsupported by the evidence. We conclude this error constitutes an abuse of discretion resulting in a miscarriage of justice.

### FACTS AND PROCEDURAL SUMMARY

*Pleadings*

Givan's petition alleged he was eligible for resentencing pursuant to Penal Code section 1170.126[1]. The district attorney opposed the petition, impliedly acknowledging that Givan was eligible for resentencing, but arguing that, if released, Givan would pose an unreasonable risk of danger to public safety. The district attorney based his argument on Givan's prior convictions as well as his conduct in prison.

Attached to the district attorney's opposition was the probation report for Givan's third-strike conviction, which occurred in 1995 while he was in prison for other crimes. The report indicated Givan was found in possession of 25 individually wrapped bindles or packages of marijuana. Marijuana was also recovered from Givan's cell, which he shared with another inmate. The total amount of marijuana recovered was 7.84 grams.

The probation report also included a summary of Givan's criminal history, which began in 1975 with a second degree burglary conviction. (§ 459.) He was sentenced to three years' probation, including 180 days in jail. In 1977, Givan was convicted of first degree burglary (*ibid.*) and sentenced to the California Youth Authority (now the Department of Juvenile Justice). In 1980, he was convicted of possession of a controlled

---

[1]Unless noted otherwise, all subsequent statutory references are to the Penal Code.

substance (Health & Saf. Code, § 11377, subd. (a)) and placed on two years' misdemeanor probation, including 90 days in jail.

In 1980, he was convicted of vandalism and placed on two years' misdemeanor probation. In 1981, he was convicted of two counts of robbery and sentenced to five years in prison. In 1985, he was convicted of possession of a controlled substance (Health & Saf. Code, § 11350) and placed on two years' felony probation. In 1987, he was convicted of possession of cocaine base for sale (Health & Saf. Code, § 11351.5) and sentenced to five years in prison. In 1990, he was convicted of first degree burglary with several enhancements (§§ 459, 667.5, subd. (b)), including three section 667, subdivision (a), prior serious-felony enhancements. He was sentenced to 23 years in prison. (*People v. Givan* (1992) 4 Cal.App.4th 1107.[2])

The next relevant exhibit attached to the district attorney's opposition was a preconviction probation officer's report from Los Angeles County for the 1990 conviction. The relevant portion of this report confirms that Givan was arrested with Terry Louis Lee and Derrick Jay Jackson. The report also states several arming enhancements were charged, including an allegation that Givan personally used a firearm, but since this was a pretrial report, there is no indication the enhancements were found true. The probation report purports to describe the burglary and states that the three defendants entered the garage of the victim's home when he opened the garage

---

[2]The appellate opinion states Givan was sentenced to the upper term of six years in prison, plus one year for the section 667.5, subdivision (b) enhancement, for a total of seven years. It appears the opinion failed to include the three section 667, subdivision (a), prior serious-felony enhancements, which added five years to Givan's sentence for each enhancement. The opinion also indicates that Givan's two codefendants, Derrick Jay Jackson and Terry Louis Lee, were also sentenced on arming enhancements. Lee was sentenced pursuant to section 12022, while Jackson was sentenced to an additional one year because of a "principal armed with a firearm enhancement …." (*People v. Givan*, *supra*, 4 Cal.App.4th at p. 1112.) The opinion does not indicate that an arming or use enhancement was alleged or found true against Givan.

door. Two of the defendants were armed, and the victim allegedly identified Givan as armed with a shotgun. One of the perpetrators allegedly shot at the victim when he ran into the house. The perpetrators followed the victim into the house and robbed him of money, jewelry, and marijuana. No one was injured, and the stolen property was recovered.

The final group of documents included in the district attorney's opposition to Givan's petition were from the California Department of Corrections (CDC). These documents included:

1.    A rules-violation report from 2000 for possession of inmate-manufactured alcohol.

2.    A rules-violation report, also from 2000, that Givan failed to comply with CDC grooming standards. Apparently Givan's goatee violated the rules.

3.    An incident cover sheet from a prison race riot in 2003, which did not result in a rules-violation report against Givan.

4.    A rules-violation report from 2007 regarding an inmate-manufactured weapon. The report indicates Givan's cellmate possessed the weapon. The cellmate gave the weapon to Givan who attempted to dispose of the weapon while distracting the correctional officer. The report indicates the district attorney refused to prosecute the action because of a lack of evidence, but Givan was found guilty of a rules violation by CDC. The reports also noted Givan refused to submit to an unclothed body search.

5.    In 2008, Givan was found in violation of prison rules when he refused to comply with a lawful order from CDC staff. Givan refused to accept a new cellmate.

6.    A document which indicated that, in 2008, Givan was charged a fee when trash, rags, and string had to be removed from the plumbing for the toilet.

7.    In 2009, Givan was found in violation of prison rules when he submitted a urine sample which tested positive for THC (marijuana).

4.

8. In 2009, Givan was found in violation of prison rules when he refused to submit a urine test after marijuana was found in his cell.

9. A document which indicated that, on an unspecified date, Givan was observed taking two pounds of chicken from the facility kitchen where he was employed.

Givan filed a reply to the district attorney's opposition to his petition. Givan asserted he did not pose an unreasonable risk to public safety, emphasizing the remoteness of his past crimes, the absence of any assaultive offenses while he has been incarcerated, the relatively few rules violations he had incurred in the last 18 years, the positive work reports received during his incarceration, and the purpose of the Act.

Attached to the opposition were various documents from Givan's CDC file. Included were "LIFE PRISONER: PROGRESS REPORT[S]" for the period of June 2001 through June 2006. As relevant, these reports indicate Givan was assigned to various positions throughout this period. The only behavioral issue noted for the time period was the prison riot discussed above.

An annual review from 2006 notes Givan had two periods of disciplinary-free behavior and two periods of average or above-average work history. The 2007 annual review makes the same observations. The 2010 annual review notes Givan had "2 QPs of no serious CDCR 115s," and "QP of average/above average work/school performance." The 2011 annual review noted two "QPs" without serious CDCR section 115 violations, and with average or above-average work and/or school performance. The 2012 annual review noted Givan received satisfactory work reviews during the period and did not have any disciplinary history for the period.

Finally, the file confirms Givan earned a high school diploma in 1978 and was trained as a sewing machine operator in 2012. Two work-supervisor reports rated Givan as satisfactory to above average in all categories for the period of April through September 2012.

Givan also submitted two "Laudatory/Informative Chrono[s]" from correctional officers indicating he was helpful and had a good work ethic. Both concluded Givan had "prepared himself to become a productive member of society." Givan's supervisor for his work position provided two "Laudatory/Informative Chrono[s]" that praised Givan for his skill and knowledge and recommended him for positions in the future.

*Testimony*

Givan testified at the hearing on his petition. He explained he lived in Michigan until his sophomore year in high school when his family moved to California. His family moved into a neighborhood dominated by a subset of the Crips criminal street gang, but Givan denied joining the criminal street gang. He admitted he began selling marijuana, burglarizing homes in the area, and eventually selling crack cocaine. All of the crimes he committed were to obtain money. He was convicted of two counts of robbery in 1981 when he stole two women's purses.

In 1990, Givan was involved in a residential burglary that he described as a "drugs transaction [that ] went bad." Givan explained he and his partner purchased some drugs from a dealer, but the merchandise "wasn't no good." The two wanted to get their money back, so they went to the drug dealer's house with a third man. When they arrived, the garage door opened. It is unclear from Givan's testimony whether all three perpetrators were armed with firearms, or whether only two of the three were armed. Nonetheless, when the garage door opened, the perpetrators entered the residence and retrieved their money from the dealer. They also took a bag of marijuana and what appeared to be a case with a disassembled gun inside. They were caught, and, with enhancements, Givan was sentenced to 26 years in prison.

Givan testified the only illegal drug he used was marijuana. He recalled that his first rules violation occurred when he was caught with marijuana in prison. He was going to smoke the marijuana because it kept him calm. He was sentenced to a third-strike term of 25 years to life for the marijuana possession. He also admitted he was involved in a

6.

prison riot that started when some white inmates attacked some black inmates. He was not found guilty of a rules violation as a result of that incident.

Givan explained the rules violation regarding the weapon in 2007. He asserted his cellmate possessed the weapon at all times. He also explained that, while criminal charges were filed, they were eventually dismissed.

In 2008, he received a rules violation for refusing a direct order. Givan explained he refused to accept a cellmate who was much younger than he because they would not get along.

He admitted a rules violation for smoking marijuana in 2009 while incarcerated. Approximately two months later he received a rules violation for refusing to provide a urine sample. Givan refused the request because he was still smoking marijuana. A short while later, he received a rules violation for possession of marijuana. Givan testified that he stopped smoking marijuana after this last incident.

Givan did not take self-help courses like anger management or narcotics anonymous because he did not feel he needed to do so. He felt he had rehabilitated himself by keeping out of situations in which he could get into trouble and by choosing his friends wisely.

If released, he planned to drive trucks for a living because those companies generally do not discriminate against people with criminal records. Givan has family and friends in the business who would help him get a job. He felt he would enjoy seeing the country in this manner. He also planned to live with his mother. He claimed he had learned from his 25 years in prison that he did not want to live a criminal life anymore, and he wanted to earn a living like everyone else.

On direct examination, Givan was asked how he would react in a situation where, as a truck driver hauling a load, the vendor refused to pay him. He responded, "I'd probably be mad, but I wouldn't react first and think second.… I wouldn't do nothing crazy .…" On cross-examination, in response to an overly convoluted hypothetical posed

by the district attorney, Givan testified that if a very smug individual refused to pay him a lot of money he had earned, placing Givan in the position of having no money and being completely without food or shelter the next month, Givan stated he "probably would have to sock him up," claiming it was a normal reaction.[3] He also testified that if released he would probably attempt to obtain a medical marijuana card legally.

*Trial court ruling*

After hearing the evidence, the trial court took the matter under submission. A written ruling was issued denying the petition. As relevant, the trial court's ruling stated as follows:

> "The court finds that the People have met their burden that the Petitioner would pose an unreasonable risk of danger to the public safety. The court notes the very dangerous facts surrounding the defendant's priors, at least one in which the defendant fired a gun at a victim. [¶] The illegal use of marijuana no doubt played a part in the defendant's violent past actions. The court is concerned about the defendant returning to the use of marijuana if he is released because of his past dangerous conduct when he was using marijuana. In fact, the petitioner testified upon release he would try to obtain a medical marijuana card. He also testified, when asked a hypothetical question about what he would do if he was a victim of theft, he would (referring to those that refused to pay him) 'sock 'em up.'"

---

[3] "Q. You remember when Ms. Moceri was saying what if you drive a truck for somebody, you do a good job, you deliver, the load, it's just like it's supposed to be on time and the guy goes, yeah, sorry, whatever and just, you know, really gyps you out of the money. Let me add one thing to that. It's a lot of money. It's next—it's what you are going to live on next month. It isn't $25. It's next month you are going to go hungry. You are not going to be able to pay the rent next month. And this guy is standing there grinning at you because he got one over on you. He did. And he knew he was going to do it, too. You could just tell by looking at him he was going to do it and he got it over on you and now there you stand as my husband says, with your elbow halfway up your arm and then what? Now what are you going to do? [¶] A. If I was being honest— [¶] Q. Yes, please. [¶] A.—I think I probably would have to sock him up."

8.

## *DISCUSSION*

Section 1170.126, enacted as part of the Act, defines those eligible for resentencing as inmates serving an indeterminate third-strike sentence and also:

1.       not serving a sentence for a crime that is listed as a serious or violent felony (§§ 667.5, subd. (c) & 1192.7, subd. (c));

2.       not serving a sentence for a crime committed under the circumstances listed in section 667 subdivision (e)(2)(C), clauses (i) through (iii), or section 1170.12, subdivision (c)(2)(C), clauses (i) through (iii); and

3.       who does not have a prior conviction for an offense appearing in section 667, subdivision (e)(2)(C), clause (iv), or section 1170.12, subdivision (c)(2)(C), clause (iv).  (§ 1170.126, subd. (e).)

If an inmate is eligible under the statute, then he must be resentenced "unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety."  (§ 1170.126, subd. (f).)

This statute requires the trial court to conduct a two-step analysis.  First, the trial court must determine if the inmate is eligible for resentencing.  If the inmate is eligible for resentencing, then the trial court must decide if resentencing the inmate would pose an unreasonable risk of danger to public safety.  An inmate will be resentenced only if he or she is eligible, and the trial court concludes he or she does not pose an unreasonable risk of danger to public safety.  (*People v. Superior Court (Kaulick)* (2013) 215 Cal.App.4th 1279, 1299.)  If the inmate is ineligible for resentencing, or the trial court concludes in the exercise of its discretion the inmate would pose an unreasonable risk of danger to public safety, then the petition is denied.

The trial court concluded, and the parties agree, that Givan met the eligibility requirements for resentencing.  If the petitioner is eligible for resentencing, "the petitioner shall be resentenced pursuant to paragraph (1) of subdivision (e) of Section 667 and paragraph (1) of subdivision (c) of Section 1170.12 unless the court, in its discretion,

9.

determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." (§ 1170.126, subd. (f).) In exercising its discretion, "the court may consider: [¶] (1) The petitioner's criminal conviction history, including the type of crimes committed, the extent of injury to victims, the length of prior prison commitments, and the remoteness of the crimes; [¶] (2) The petitioner's disciplinary record and record of rehabilitation while incarcerated; and [¶] (3) Any other evidence the court, within its discretion, determines to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety." (§ 1170.126, subd. (g).)

The dispute in this case is whether the trial court abused its discretion when it concluded that resentencing Givan would pose an unreasonable risk of danger to public safety. "'Abuse of discretion' has been defined as follows: '"The discretion intended … is not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles. It is not mental discretion, to be exercised ex gratia, but a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice."' [Citations.]" (*People v. Superior Court* (*Mouchaourab*) (2000) 78 Cal.App.4th 403, 413.) A trial court abuses its discretion if the factual findings critical to its decision are not supported by the evidence. (*People v. Cluff* (2001) 87 Cal.App.4th 991, 998.) It is an appellant's burden to establish that the trial court abused its discretion. (*Steele v. Jensen Instrument Co.* (1997) 59 Cal.App.4th 326, 330.)

Givan begins his argument by raising numerous procedural issues that have been addressed in prior cases, and many of which are now pending before the California Supreme Court. This court has addressed these issues in published cases, which the Supreme Court has accepted for review. Since these issues have already been addressed and will likely be addressed by the Supreme Court, we will simply state our conclusions with citations to published cases that have not been accepted for review, if possible.

10.

First, in the trial court, the burden was on the prosecution to prove by a preponderance of the evidence that resentencing Givan posed an unreasonable risk of danger to public safety. Givan was not entitled to a jury trial. (*People v. Osuna* (2014) 225 Cal.App.4th 1020, 1038-1040; *People v. Superior Court (Kaulick), supra,* 215 Cal.App.4th at pp. 1301-1305.)

Second, we review the trial court's ruling under the deferential abuse of discretion standard. Section 1170.126, subdivisions (f) and (g), clearly state that when the trial court decides if a petitioner poses an unreasonable risk of danger to public safety, it is exercising its discretion. No reasonable interpretation of these subdivisions could arrive at a different conclusion.

Third, as this court concluded in *People v. Valencia* (2014) 232 Cal.App.4th 514, the definition of unreasonable risk of danger to public safety found in Proposition 47 and codified in section 1170.18, subdivision (c), is not applicable to petitions filed pursuant to Proposition 36 as codified in section 1170.126.[4]

On November 4, 2014, voters enacted Proposition 47, "the Safe Neighborhoods and Schools Act" (hereafter Proposition 47). It went into effect the next day. (Cal. Const., art. II, § 10, subd. (a).) Insofar as is pertinent here, Proposition 47 renders misdemeanors certain drug- and theft-related offenses that previously were felonies or "wobblers," unless they were committed by certain ineligible defendants. Proposition 47 also created a new resentencing provision—section 1170.18—by which a person currently serving a felony sentence for an offense that is now a misdemeanor may petition for a recall and resentencing in accordance with the offense statutes as added or

---

[4]The Supreme Court has granted the petition for review in *People v. Valencia, supra,* 232 Cal.App.4th 524 (review granted Feb. 18, 2015, S223825), but until the Supreme Court issues its interpretation of the relevant provisions, our analysis remains unchanged. To comply with California Rules of Court, rule 8.1115, we repeat our analysis.

11.

amended by Proposition 47. (§ 1170.18, subd. (a).) A person who satisfies the criteria in subdivision (a) of section 1170.18 shall have his or her sentence recalled and be "resentenced to a misdemeanor … unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." (*Id.,* subd. (b).)

Hidden in the lengthy, fairly abstruse text of the proposed law, as presented in the official ballot pamphlet—and nowhere called to voters' attention—is the provision at issue in the present appeal. Subdivision (c) of section 1170.18 provides: "As used throughout this Code, 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." Section 667, subdivision (e)(2)(C)(iv), lists the following felonies, sometimes called "super strike" offenses:

> "(I)  A 'sexually violent offense' as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code.

> "(II)  Oral copulation with a child who is under 14 years of age, and who is more than 10 years younger than he or she as defined by Section 288a, sodomy with another person who is under 14 years of age and more than 10 years younger than he or she as defined by Section 286, or sexual penetration with another person who is under 14 years of age, and who is more than 10 years younger than he or she, as defined by Section 289.

> "(III)  A lewd or lascivious act involving a child under 14 years of age, in violation of Section 288.

> "(IV) Any homicide offense, including any attempted homicide offense, defined in Sections 187 to 191.5, inclusive.

> "(V)  Solicitation to commit murder as defined in Section 653f.

> "(VI)  Assault with a machine gun on a peace officer or firefighter, as defined in paragraph (3) of subdivision (d) of Section 245.

12.

"(VII)  Possession of a weapon of mass destruction, as defined in paragraph (1) of subdivision (a) of Section 11418.

"(VIII)  Any serious and/or violent felony offense punishable in California by life imprisonment or death."

The question is whether section 1170.18, subdivision (c), now limits a trial court's discretion to deny resentencing under the Act to those cases in which resentencing a defendant would pose an unreasonable risk that he or she will commit a new "super strike" offense.  Defendant says it does.  The People disagree.  We agree with the People.

"'In interpreting a voter initiative … , we apply the same principles that govern statutory construction.  [Citation.]'  [Citation.]  '"The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law.  [Citations.]"'  [Citation.]"  (*People v. Superior Court* (*Cervantes* ) (2014) 225 Cal.App.4th 1007, 1014 (*Cervantes*).)  Thus, in the case of a provision adopted by the voters, "their intent governs."  (*People v. Jones* (1993) 5 Cal.4th 1142, 1146.)

To determine intent, "'"we look first to the words themselves.  [Citations.]"'" (*Cervantes*, *supra,* 225 Cal.App.4th at p. 1014.)  We give the statute's words "'a plain and commonsense meaning.  [Citation.]  We do not, however, consider the statutory language "in isolation."  [Citation.]  Rather, we look to "the entire substance of the statute … in order to determine the scope and purpose of the provision ….  [Citation.]" [Citation.]  That is, we construe the words in question "'in context, keeping in mind the nature and obvious purpose of the statute ….' [Citation.]" [Citation.]  We must harmonize "the various parts of a statutory enactment … by considering the particular clause or section in the context of the statutory framework as a whole."  [Citations.]' [Citation.]"  (*People v. Acosta* (2002) 29 Cal.4th 105, 112.)  We "accord[] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose.  A construction making some words surplusage is to be avoided.…  [S]tatutes or statutory sections relating to the same subject must be harmonized, both internally and with each

13.

other, to the extent possible. [Citations.]" (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387.)

"'"'When statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it." [Citation.]' [Citation.]" (*People v. Hendrix* (1997) 16 Cal.4th 508, 512.) On its face, "[a]s used throughout this Code," as employed in section 1170.18, subdivision (c), clearly and unambiguously refers to the Penal Code, not merely section 1170.18 or the other provisions contained in Proposition 47. (See *People v. Bucchierre* (1943) 57 Cal.App.2d 153, 164-165; see also *Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241, 1254-1255 (*Marshall*); *People v. Vasquez* (1992) 7 Cal.App.4th 763, 766.) This does not mean, however, that the definition contained in section 1170.18, subdivision (c), must inexorably be read into section 1170.126, subdivision (f). (Cf. *Marshall, supra,* at p. 1255.) "The literal language of a statute does not prevail if it conflicts with the lawmakers' intent …." (*Osuna, supra,* 225 Cal.App.4th at pp. 1033-1034.) "'The apparent purpose of a statute will not be sacrificed to a literal construction.' [Citation.]" (*Cossack v. City of Los Angeles* (1974) 11 Cal.3d 726, 733.) Rather, "the literal meaning of a statute must be in accord with its purpose." (*People v. Mohammed* (2008) 162 Cal.App.4th 920, 927.) "[I]t is settled that the language of a statute should not be given a literal meaning if doing so would result in absurd consequences that the [voters] did not intend" (*In re Michele D.* (2002) 29 Cal.4th 600, 606) or would "frustrate[] the manifest purposes of the legislation as a whole …." (*People v. Williams* (1992) 10 Cal.App.4th 1389, 1393.) "To this extent, therefore, intent prevails over the letter of the law and the letter will be read in accordance with the spirit of the enactment. [Citation.]" (*Michele D., supra,* at p. 606; accord, *People v. Ledesma* (1997) 16 Cal.4th 90, 95.)

Thus, "'we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the

14.

statute is a part. [Citations.]' [Citation.] We also "'refer to other indicia of the voters' intent, particularly the analyses and arguments contained in the official ballot pamphlet." [Citation.]' [Citation.]" (*Osuna, supra,* 225 Cal.App.4th at p. 1034.) We consider "the consequences that will flow from a particular interpretation" (*Dyna-Med, Inc. v. Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1387), as well as "the wider historical circumstances" of the statute's or statutes' enactment. (*Ibid.*) "'Using these extrinsic aids, we "select the construction that comports most closely with the apparent intent of the [electorate], with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' [Citation.]" (*Osuna, supra,* at pp. 1034-1035.)

Proposition 47 and the Act address related, but not identical, subjects. As we explain, reading them together, and considering section 1170.18, subdivision (c), in the context of the statutory framework as a whole (see *People v. Acosta, supra,* 29 Cal.4th at p. 112; *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 658-659; *In re Cindy B.* (1987) 192 Cal.App.3d 771, 781), we conclude its literal meaning does not comport with the purpose of the Act, and applying it to resentencing proceedings under the Act would frustrate, rather than promote, that purpose and the intent of the electorate in enacting both initiative measures. (See *People v. Disibio* (1992) 7 Cal.App.4th Supp. 1, 5.)

As is evidenced by its title, the Act was aimed solely at revising the three strikes law. That law, as originally enacted by the Legislature, was described by us as follows:

> "Under the three strikes law, defendants are punished not just for their current offense but for their recidivism. Recidivism in the commission of multiple felonies poses a danger to society justifying the imposition of longer sentences for subsequent offenses. [Citation.] The primary goals of recidivist statutes are: ' … to deter repeat offenders and, at some point in the life of one who repeatedly commits criminal offenses serious enough to be punished as felonies, to segregate that person from the rest of society for an extended period of time. This segregation and its

15.

duration are based not merely on that person's most recent offense but also on the propensities he has demonstrated over a period of time during which he has been convicted of and sentenced for other crimes. Like the line dividing felony theft from petty larceny, the point at which a recidivist will be deemed to have demonstrated the necessary propensities and the amount of time that the recidivist will be isolated from society are matters largely within the discretion of the punishing jurisdiction.' [Citation.]

"By enacting the three strikes law, the Legislature acknowledged the will of Californians that the goals of retribution, deterrence, and incapacitation be given precedence in determining the appropriate punishment for crimes. Further, those goals were best achieved by ensuring 'longer prison sentences and greater punishment' for second and third 'strikers.'" (*People v. Cooper* (1996) 43 Cal.App.4th 815, 823-824.)

A few months before the November 6, 2012, election, the California Supreme Court observed: "One aspect of the [three strikes] law that has proven controversial is that the lengthy punishment prescribed by the law may be imposed not only when … a defendant [who has previously been convicted of one or more serious or violent felonies] is convicted of another serious or violent felony but also when he or she is convicted of any offense that is categorized under California law as a felony. This is so even when the current, so-called triggering, offense is nonviolent and may be widely perceived as relatively minor. [Citations.]" (*In re Coley* (2012) 55 Cal.4th 524, 528-529.)

Clearly, by approving the Act, voters resolved this controversy in favor of strike offenders. Thus, one of the "Findings and Declarations" of the Act stated the Act would "[r]estore the Three Strikes law to the public's original understanding by requiring life sentences only when a defendant's current conviction is for a violent or serious crime." (Voter Information Pamp., Gen. Elec. (Nov. 6, 2012) text of proposed law, § 1, p. 105.) Nowhere, however, do the ballot materials for the Act suggest voters intended essentially to open the prison doors to existing third strike offenders in all but the most egregious cases, as would be the result if the definition of "'unreasonable risk of danger to public safety'" contained in section 1170.18, subdivision (c), were grafted onto resentencing proceedings under section 1170.126, subdivision (f). That voters did *not* intend such a

16.

result is amply demonstrated by the fact that an indeterminate life term remains mandatory under the Act for a wide range of current offenses even if the offender does not have a prior conviction for a "super strike" offense (§§ 667, subd. (e)(2), 1170.12, subd. (c)(2)) and that an inmate is rendered ineligible for resentencing under section 1170.126 for an array of reasons beyond his or her having suffered such a prior conviction.  (§ 1170.126, subd. (e)(2).)

The Act clearly placed public safety above the cost savings likely to accrue as a result of its enactment.  Thus, uncodified section 7 of the Act provides:  "*This act is an exercise of the public power of the people of the State of California **for the protection of the health, safety, and welfare of the people of the State of California**, and shall be liberally construed to effectuate those purposes*."  (Voter Information Pamp., Gen. Elec., *supra,* text of proposed law, p. 110, bolding omitted.)  As we explained in *Osuna, supra,* 225 Cal.App.4th at page 1036, "Although the Act 'diluted' the three strikes law somewhat [citation], '[e]nhancing public safety was a key purpose of the Act' [citation]."

In contrast, Proposition 47—while titled "the Safe Neighborhoods and Schools Act"—emphasized monetary savings.  The "Findings and Declarations" state:  "The people of the State of California find and declare as follows:  [¶]  The people enact the Safe Neighborhoods and Schools Act to ensure that prison spending is focused on violent and serious offenses, to maximize alternatives for nonserious, nonviolent crime, and to invest the savings generated from this act into prevention and support programs in K-12 schools, victim services, and mental health and drug treatment.  This act ensures that sentences for people convicted of dangerous crimes like rape, murder, and child molestation are not changed."  (Voter Information Pamp., Gen. Elec. (Nov. 4, 2014) text of proposed law, § 2, p. 70.)  Uncodified section 15 of the measure provides:  "This act shall be broadly construed to accomplish its purposes," while uncodified section 18 states:  "This act shall be liberally construed to effectuate its purposes."  (Voter Information Pamp., Gen. Elec., *supra,* text of proposed law, p. 74.)  Proposition 47

17.

requires misdemeanor sentences for various drug possession and property offenses, unless the perpetrator has a prior conviction for a "super strike" offense or for an offense requiring sex offender registration pursuant to section 290, subdivision (c). (Health & Saf. Code, §§ 11350, subd. (a), 11357, subd. (a), 11377, subd. (a); §§ 459.5, subd. (a), 473, subd. (b), 476a, subd. (b), 490.2, subd. (a), 496, subd. (a), 666, subd. (b).) Section 1170.18 renders ineligible for resentencing *only* those inmates whose current offenses would now be misdemeanors, but who have prior convictions for "super strike" offenses or for offenses requiring sex offender registration pursuant to section 290, subdivision (c). (§ 1170.18, subds. (a), (i).)

Nowhere in the ballot materials for Proposition 47 were voters given any indication that the initiative, which dealt with offenders whose current convictions would now be misdemeanors rather than felonies, had any impact on the Act, which dealt with offenders whose current convictions *would still be felonies,* albeit not third strikes. For instance, the official title and summary stated, in pertinent part, that Proposition 47 would "[r]equire[] resentencing for persons serving felony sentences for these offenses [, i.e., offenses that require misdemeanor sentences under the measure] unless court finds unreasonable public safety risk." (Voter Information Pamp., Gen. Elec., *supra*, official title and summary, p. 34.) In explaining what Proposition 47 would do, the Legislative Analyst stated: "This measure reduces penalties for certain offenders convicted of *nonserious and nonviolent property and drug crimes.* The measure also allows certain offenders *who have been previously convicted of such crimes* to apply for reduced sentences." (Voter Information Pamp., Gen. Elec., *supra,* analysis of Prop. 47 by Legis. Analyst, p. 35, italics added.) With respect to the resentencing provision, the Legislative Analyst explained:

> "This measure allows offenders *currently serving felony sentences for the above crimes* [i.e., grand theft, shoplifting, receiving stolen property, writing bad checks, check forgery, and drug possession] to apply to have their felony sentences reduced to misdemeanor sentences. In addition,

18.

certain offenders who have already completed a sentence for a felony that the measure changes could apply to the court to have their felony conviction changed to a misdemeanor.  However, no offender who has committed a specified severe crime could be resentenced or have their conviction changed.  In addition, the measure states that a court is not required to resentence an offender currently serving a felony sentence if the court finds it likely that the offender will commit a specified severe crime.  Offenders who are resentenced would be required to be on state parole for one year, unless the judge chooses to remove that requirement."  (Voter Information Pamp., Gen. Elec., *supra,* analysis of Prop. 47 by Legis. Analyst, p. 36, italics added.)

Similarly, the arguments in favor of and against Proposition 47 spoke in terms solely of Proposition 47 and never mentioned the Act.  The "Argument in Favor of Proposition 47" spoke in terms of prioritizing serious and violent crime so as to stop wasting prison space "on petty crimes," stop "wasting money on warehousing people in prisons for nonviolent petty crimes," and stop California's overcrowded prisons from "incarcerating too many people convicted of low-level, nonviolent offenses."  (Voter Information Pamp., Gen. Elec., *supra*, argument in favor of Prop. 47, p. 38.)  The "Rebuttal to Argument Against Proposition 47" reiterated these themes and never suggested Proposition 47 would have any effect on resentencing under the Act.  (See Voter Information Pamp., Gen. Elec., *supra*, rebuttal to argument against Prop. 47, p. 39.)  Although the "Rebuttal to Argument in Favor of Proposition 47" asserted 10,000 inmates would be eligible for early release under the measure, and that many of them had prior convictions "for serious crimes, such as assault, robbery and home burglary" (Voter Information Pamp., Gen. Elec., *supra*, rebuttal to argument in favor of Prop. 47, p. 38), there is no suggestion the early-release provisions would extend to inmates whose current offenses remained felonies under the Act.  The same is true of the discussion of resentencing contained in the "Argument Against Proposition 47."  (Voter Information Pamp., Gen. Elec., *supra*, argument against Prop. 47, p. 39.)

In light of the foregoing, we cannot reasonably conclude voters intended the definition of "'unreasonable risk of danger to public safety'" contained in

19.

section 1170.18, subdivision (c), to apply to that phrase as it appears in section 1170.126, subdivision (f), despite the former section's preamble, "As used throughout this Code …." Voters cannot intend something of which they are unaware.

We are cognizant one of the Act's authors has taken the position that Proposition 47's definition of "unreasonable risk of danger" applies to resentencing proceedings under the Act. (St. John & Gerber, *Prop. 47 jolts landscape of California justice system,* Los Angeles Times (Nov. 5, 2014), <http://www.latimes.com/local/politics/la-me-ff-pol-proposition47-20141106-story.html> [as of July 14, 2016].) Looking at the information conveyed to voters, however, this clearly was not *their* intent and so an author's desire is of no import. (Cf. *People v. Garcia* (2002) 28 Cal.4th 1166, 1175-1176, fn. 5; *People v. Bradley* (2012) 208 Cal.App.4th 64, 83; *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 30.)

We are also mindful "it has long been settled that '[t]he enacting body is deemed to be aware of existing laws and judicial constructions in effect at the time legislation is enacted' [citation], 'and to have enacted or amended a statute in light thereof' [citation]. 'This principle applies to legislation enacted by initiative. [Citation.]' [Citation.]" (*Cervantes*, *supra,* 225 Cal.App.4th at p. 1015; accord, *In re Lance W.* (1985) 37 Cal.3d 873, 890, fn. 11.) Thus, we presume voters were aware that an "unreasonable risk of danger to public safety," as used in section 1170.126, subdivision (f), had been judicially construed as not being impermissibly vague, but as nevertheless having no fixed definition. (*People v. Garcia* (2014) 230 Cal.App.4th 763, 769-770; *People v. Flores* (2014) 227 Cal.App.4th 1070, 1075.) Because nowhere in the ballot materials for Proposition 47 was it called to voters' attention that the definition of the phrase contained in section 1170.18, subdivision (c), would apply to resentencing proceedings under the Act, we simply cannot conclude voters intended Proposition 47 to alter the Act in that respect. Voters are not asked or presumed to be able to discern all potential effects of a

proposed initiative measure; this is why they are provided with voter information pamphlets containing not only the actual text of such a measure, but also a neutral explanation and analysis by the Legislative Analyst and arguments in support of and in opposition to the measure. As we have already observed, none of those materials so much as hinted that Proposition 47 could have the slightest effect on resentencing under the Act. (Cf. *Marshall, supra,* 119 Cal.App.4th at pp. 1255-1256 [leg. history of enactment included information bill would add definition of particular term to Pub. Contract Code].)

We are asked to infer an intent to extend section 1170.18, subdivision (c)'s definition to proceedings under section 1170.126 because the phrase in question only appears in those sections of the Penal Code. We cannot do so. The only resentencing mentioned in the Proposition 47 ballot materials was resentencing for inmates whose current offenses would be reduced to *misdemeanors,* not those who would still warrant *second strike felony terms.* There is a huge difference, both legally and in public safety risked, between someone with multiple prior serious and/or violent felony convictions whose current offense is (or would be, if committed today) a misdemeanor, and someone whose current offense is a felony. Accordingly, treating the two groups differently for resentencing purposes does not lead to absurd results, but rather is eminently logical.

We recognize that "[i]t is an established rule of statutory construction … that when statutes are *in pari materia* similar phrases appearing in each should be given like meanings. [Citations.]" (*People v. Caudillo* (1978) 21 Cal.3d 562, 585, overruled on another ground in *People v. Martinez* (1999) 20 Cal.4th 225, 229, 237, fn. 6, & disapproved on another ground in *People v. Escobar* (1992) 3 Cal.4th 740, 749-751 & fn. 5; see *Robbins v. Omnibus R. Co.* (1867) 32 Cal. 472, 474.) We question whether Proposition 47 and the Act are truly in pari materia: That phrase means "[o]n the same subject; relating to the same matter" (Black's Law Dict. (9th ed. 2009) p. 862), and the two measures (albeit with some overlap) address different levels of offenses and

21.

offenders. In any event, "canons of statutory construction are merely aids to ascertaining probable legislative intent" (*Stone v. Superior Court* (1982) 31 Cal.3d 503, 521, fn. 10); they are "mere guides and will not be applied so as to defeat the underlying legislative intent otherwise determined [citation]." (*Dyna-Med, Inc. v. Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1391.)

The Act was intended to reform the three strikes law while keeping intact that scheme's core commitment to public safety. Allowing trial courts broad discretion to determine whether resentencing an eligible petitioner under the Act "would pose an unreasonable risk of danger to public safety" (§ 1170.126, subd. (f)) clearly furthers the Act's purpose. Whatever the wisdom of Proposition 47's policy of near-universal resentencing where *misdemeanants* are concerned—and "[i]t is not for us to gainsay the wisdom of this legislative choice" (*Bernard v. Foley* (2006) 39 Cal.4th 794, 813)—constraining that discretion so that all but the worst *felony* offenders are released manifestly does not comport with voters' intent in enacting either measure.

Accordingly, Proposition 47 has no effect on defendant's petition for resentencing under the Act. Defendant is not entitled to a remand so the trial court can redetermine defendant's entitlement to resentencing under the Act utilizing the definition of "'unreasonable risk of danger to public safety'" contained in section 1170.18, subdivision (c).

We now return to the primary issue in this case: Did the trial court abuse its discretion when it concluded Givan posed an unreasonable risk of danger to public safety? As stated above, section 1170.126, subdivision (g), provides the trial courts with guidance in exercising their discretion. This subdivision permits, but does not require, the trial courts to consider (1) the petitioner's criminal conviction history, (2) the petitioner's disciplinary and rehabilitation history while incarcerated, and (3) any other evidence the trial court deems relevant.

22.

In our summary, we reviewed at length the evidence before the trial court. Based on this evidence, the trial court concluded Givan posed an unreasonable risk of danger to public safety because of the "very dangerous facts surrounding [Givan's] priors, at least one in which [Givan] fired a gun at a victim." The trial court also observed that Givan's dangerous behavior was driven by his use of marijuana, and Givan expressed at the hearing the desire to obtain a medical marijuana prescription. The trial court reasoned that if Givan began smoking marijuana again he would return to committing dangerous crimes.

The difficulty with the trial court's analysis is that the facts underlying the primary finding are absent support in the record. The assertion that Givan shot at the victim in the 1990 burglary is simply not there. While the record and Givan's testimony are confusing as to whether he was armed, the only reference to the firing of a weapon is found in the *pretrial* probation report. The report, however, does not state Givan shot a weapon at the victim, only that one of the three perpetrators shot at the victim. Moreover, since the matter proceeded to a jury trial, it appears a pretrial probation report is not the most reliable source of factual information about the events that occurred. We also note the appellate opinion from that conviction does not indicate the jury found true an arming enhancement pertaining to Givan. The only evidence of the arming enhancement was found in the CLETS report submitted by the prosecution, but the reliability of this report is also questionable. The CLETS report indicates Givan was convicted of "459 PC-BURGLARY: FIRST DEGREE-ARMED WITH FIREARM" and was sentenced to 16 years in prison. The sentence indicated in this report is incorrect, bringing into question the reliability of the entire entry. Finally, we observe that the prosecutor conceded there was no evidence Givan shot at the victim.

In summary, there is no evidence that Givan shot at the victim in the 1990 burglary, and it is unclear whether Givan was armed during the burglary.[5]  There is no evidence anyone was injured during the burglary, nor is there any evidence Givan used a weapon during any other crime or that any of his crimes caused an injury to a victim.[6]  Therefore, the evidence does not support the trial court's assertion that there were "very dangerous facts surrounding [Givan's] priors, at least one in which [Givan] fired a gun at a victim."[7]

We also question the trial court's reliance on Givan's testimony that he would legally attempt to obtain a medical marijuana prescription if released.  The trial court inferred from this testimony that if Givan began smoking marijuana, he would return to his life of crime.  As this conclusion is not substantiated in the record below, upon return to the trial court, if this again forms the basis of the court's finding of "unreasonable risk," further articulation will be necessary.  An issue may arise if Givan didn't have the funds to obtain the prescription and the marijuana.  However, Givan provided testimony that he would be able to obtain a job driving a truck with his cousin, suggesting he would not have to commit any crimes to obtain funds.[8]

Finally, we note that Givan testified he would strike an individual who refused to pay wages that Givan had legally earned.  While not condoning Givan's response, we

---

[5]In the respondent's brief, the Attorney General states that Givan denied possessing a gun during the robbery.

[6]We acknowledge Givan was convicted of two robberies, but the only evidence about these two incidents was provided by Givan who described them as purse snatching cases.  He testified he did not use a weapon in these incidents.

[7]It is true, however, the 1990 burglary involved the use of firearms and was thus a dangerous crime.

[8]Whether a truck driver could get a medical marijuana card, or whether he could drive a truck with traces of marijuana in his system, is not an issue we need to decide here.

observe that the hypothetical question posed by the prosecutor was not based on any facts and was so inflammatory that any response by Givan would have been considered to his detriment. Had Givan responded he would have been okay without eating or having shelter the next month, the conclusion that he was lying could easily have been drawn. There was no right answer to the hypothetical as posed by the prosecutor.

It appears the trial court placed principle reliance on its assumption that Givan shot at the victim of the 1990 burglary. Because there is nothing in the record to support this assumption, the trial court abused its discretion in denying the petition. (*People v. Cluff, supra,* 87 Cal.App.4th at p. 998 [trial court abuses discretion if factual finding critical to its decision is not supported by evidence].) Nonetheless, reversal is required only if the error amounted to a miscarriage of justice. (*People v. Harris* (2013) 57 Cal.4th 804, 842; *People v. Watson* (1956) 46 Cal.2d 818, 834-836.) Based on the record as presented, we must conclude the error amounted to just such a miscarriage.

After examining the entire case, we conclude it is reasonably probable that a result more favorable to Givan would have been obtained in the absence of the error, thus requiring reversal of the order denying the petition. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.) The trial court placed great reliance on Givan's asserted dangerousness, especially his purportedly firing a firearm at the victim of the 1990 burglary. There was no other evidence that, at any time, Givan had used a weapon in the crimes he committed or that any victim had ever been injured. Under these circumstances, the appropriate remedy is to reverse the order denying the petition.

Our reversal of the order denying the petition is not to be read as an order to grant the petition. Our holding is based on the trial court's reliance on specific facts unsupported by the record. Accordingly, we are reversing the order to permit the trial court to consider all the relevant evidence in the record that is supported by substantial evidence and exercise its discretion based on those facts. In doing so, the trial court may or may not reach the same conclusion. There are certainly facts that would support either

view.  The decision, however, must in the first instance be made by the trial court.  In the event the trial court reaches the same conclusion, further articulation regarding the nexus between marijuana use (or non-use) and "unreasonable risk of danger to public safety" will be necessary.

## *DISPOSITION*

The order denying the petition is reversed, and the matter is remanded to the trial court for reconsideration of Givan's petition for resentencing in light of this opinion.